IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PENN NATIONAL MUTUAL            )
CASUALTY INSURANCE COMPANY,     )
                                )
          Plaintiff,            )
                                )
     v.                         )          1:17CV1155
                                )
VIKING PIZZA, INC., MARCUS      )
ALFONSO KEARSE, JUWAN           )
CHRISTOPHER HARRINGTON, and     )
YOLANA IRVING,                  )
                                )
          Defendants.           )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before the court are cross-motions for summary judgment
filed by Plaintiff/Counter-Defendant Penn National Mutual
Casualty Insurance Company ("Penn National") and
Defendants/Counter-Plaintiffs Yolanda Irving ("Irving") and
Juwan Christopher Harrington ("Harrington"). (Docs. 54, 62.)
Defendants Viking Pizza, Inc. ("Viking") and Marcus Alfonso
Kearse ("Kearse") have not appeared in this action in any way.
Penn National filed this declaratory judgment action seeking
relief from any duty to indemnify Defendant Viking or Kearse due
to Viking's alleged failure to cooperate or provide notice about
a vehicle accident that occurred on September 14, 2014, while
Kearse was working as a Domino's delivery driver for Viking;

Kearse struck Harrington, a minor at the time. (Amended Complaint ("Am. Compl.") (Doc. 22).) Irving and Harrington answered and counterclaimed, seeking their own declaratory judgment that they, as judgment creditors against Viking, are entitled to recover under Viking's insurance policies with Penn National. (Answer to Am. Compl. and Counterclaim of Defs. Harrington and Irving ("Answer") (Doc. 23).) For the reasons stated herein, the court will deny both motions.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The court addresses the relevant facts here but will address other facts as necessary throughout this Opinion.

### A.   The Parties

Plaintiff Penn National is a multi-line insurance company that is incorporated under the laws of Pennsylvania, where it also has its principal place of business. (Am. Compl. (Doc. 22) ¶ 2.) Defendant Viking is a North Carolina Corporation with its principal place of business there as well. (Id. ¶ 3; Answer (Doc. 23) ¶ 3.) Viking's president is Steven Kuone ("Kuone"); Kuone is not personally a party to this action. (Am. Compl. (Doc. 22) ¶ 3.) Kuone is the sole officer of Viking. (Deposition of Steven Kuone ("Kuone Dep.") (Doc. 56) at 64-65.) Kearse is a North Carolina resident and a former employee of Viking. (Am. Compl. (Doc. 22) ¶ 4; Pl.'s Brief in Supp. of Mot. for Summary

-2-

Judgment ("Pl.'s Br.") (Doc. 63) Ex. D, Deposition of Marcus Kearse ("Kearse Dep.") (Doc. 63-4) at 5-6.)[1] Harrington is a North Carolina resident; he was seriously injured when Kearse struck him with his vehicle on September 14, 2014. (Am. Compl. (Doc. 22) ¶ 5; Pl.'s Br. (Doc. 63) Ex. F, Raleigh Police Department Crash Reconstruction Report ("RPD Report") (Doc. 63-6) at 2.) Irving is a resident of North Carolina and is Harrington's mother. (Am. Compl. (Doc. 22) ¶ 6; Ex. C, Harrington v. Kearse Complaint (Doc. 22-3) ¶ 2.)

### B. Kuone Founded Viking Pizza to Run Domino's Franchises

Steven Kuone founded Viking in 2012 to become a Domino's Pizza franchise owner. (Kuone Dep. (Doc. 56) at 11-12; Pl.'s Br. (Doc. 63) Ex. B, Viking Pizza Business Registration ("Viking Info") (Doc. 63-2).) Kuone has always been the sole owner and officer of Viking. (Kuone Dep. (Doc. 56) at 65; Viking Info (Doc. 63-2).) Viking operated four Domino's franchises in and around Wake County, North Carolina. (Kuone Dep. (Doc. 56) at 11-12.) Viking purchased insurance coverage through the Upton Group, an insurance agency in Alabama that worked frequently with Domino's franchises and sold Viking two Penn National

_____

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

-3-

policies, both of which contained notice and cooperation clauses. (Id. at 60–63; Am. Compl. (Doc. 22) Ex. A, Policy AU9 0695624 ("Auto Policy") (Doc. 22-1) at 5, 24; Am. Compl. (Doc. 22) Ex. B, Policy UL90695624 ("Umbrella Policy") (Doc. 22-2) at 5, 37–38.)

### C. **Kearse Hits Harrington on September 14, 2014**

Kearse was an employee at Viking's Domino location on New Bern Avenue in Raleigh, North Carolina. (Kearse Dep. (Doc. 63-4) at 3.) In the early afternoon of September 14, 2014, Kearse was returning to the New Bern Avenue store after delivering a pizza. (Id. at 9.) While Kearse was on his way back to the store, he struck Harrington with his car. (Id.; RPD Report (Doc. 63-6) at 2.)

No charges were filed against Kearse, and several witnesses told police that Harrington "darted in front of" Kearse. (RPD Report (Doc. 63-6) at 7.) Raleigh Police took statements from several witnesses, some of whom claimed that Kearse was driving too fast. (Id. at 11, 16.) Other witnesses disagreed. (Id. at 11.) The report included some contact information for all witnesses interviewed by Raleigh Police. (Id. at 11–13, 16.) One of the witnesses was Xavier Harrington, Harrington's brother who was one of the three crossing the street when Kearse struck; his contact information was also included in the report. (Id. at

-4-

12.) Some witnesses were not included in the accident report. (Deposition of Ronald C. Dilthey ("Dilthey Dep.") (Doc. 58) at 23.)

### D.  **Viking's Response to the Accident**

Kuone learned about Kearse's accident on the same day it occurred, September 14, 2014, when the general manager of the New Bern Avenue store, Rebecca Dixon, called Kuone to inform him. (Kuone Dep. (Doc. 56) at 20-21.) The remainder of Kuone's recount of that day and the steps he took was based on his recollection of what were the "typical steps that [Viking] would take" after an accident. (Id. at 21.) Kuone noted that those steps included the following:

Q.   And after you found about that, what steps did you take to investigate it or –

A.   Uh-huh.

Q.    -- find out about it, other than talking to her?

A.   Yeah. Suspended [Kearse] and -- I mean -- and this is, you know, not speculation, but the typical steps that we would take. I don't recall specifically the steps, but --

Q.   Uh-huh.

A.   -- typically the first thing you would do is suspend the driver pending a motor vehicle report. Once it's deemed that the motor vehicle report, that they're still eligible to drive for Domino's, then they return to work.

Q.   Okay.

> A.   Report, of course, to the insurance agency, as well, and, of course, get a -- you know, any other corresponding info that the insurance agency might need.
>
> Q.   Okay. So you believe in this -- with this accident you contacted the insurance agency –
>
> A.   Yes.
>
> Q.   -- shortly after the accident?
>
> A.   Yes.

(Id. at 21–22.) Kuone did not recall how he notified the insurance agency, but, when asked if he remembered doing it, Kuone responded "yeah, absolutely." (Id. at 22.) Later during his deposition, Kuone also stated he did not have a "specific recollection" of reporting the incident but instead believes he did because it was "part of the process." (Id. at 82, 104.) The parties agree that there is no record of the accident being reported to Upton or Penn National on or around September 14, 2014. (Defs.' Brief in Supp. of Mot. for Summ. Judgment ("Defs.' Br.") (Doc. 55) at 22; Pl.'s Br. (Doc. 63) at 4 n.2).

Kuone was also asked, "Do you remember specifically making any decision, 'I'm not going to talk to [Penn National]'?" (Kuone Dep. (Doc. 56) at 105.) Kuone responded, "No." (Id.) At another point, Kuone testified that he did not "intentionally decide to not follow [his] standard practice for [reporting the] accident." (Id. at 104.)

-6-

**E.** **The Underlying Lawsuit**

Shortly after the accident, Harrington and Irving contacted Julie L. Bell, an attorney with the law firm Patterson Dilthey, LLP, to discuss pursuing a negligence action against Kearse and Viking (the "Underlying Lawsuit"). (Dilthey Dep. (Doc. 58) at 17.) A formal retainer was signed two years later. (Id. at 18.)

Ronald Dilthey, one of Bell's partners, and Bell began attempting to reach out to Viking via mail. On December 16, 2015, Bell sent a letter to Viking at Viking's registered address, 305 Chastain Court, Jacksonville, North Carolina, 28546. (Pl.'s Br. (Doc. 63) Ex. N, December 16, 2015 Letter from Julie Bell to Viking ("Bell Letter") (Doc. 63-14) at 2; Viking Info (Doc. 63-2).) The letter was sent via regular mail and not returned as undeliverable. (Dilthey Dep. (Doc. 58) at 48–49.) Kuone was "sure" he did not recall seeing the letter before his 2019 deposition. (Kuone Dep. (Doc. 56) at 25.) While Viking owned the Domino's franchises, Kuone, Viking's only officer, was splitting his time between his home in Jacksonville and an apartment he rented in Raleigh. (Id. at 26–27; Deposition of Shonda Kuone ("Shonda Kuone Dep.") (Doc. 59) at 12.) The Bell Letter did not ever use the words "sue," "suit," "lawsuit," or "claim," but it was on law firm letterhead and requested that Viking have their insurance carrier contact the firm directly.

-7-

(Bell Letter (Doc. 63-14) at 2.) Dilthey and Bell did not receive any response from Viking. (Dilthey Dep. (Doc. 58) at 50.)

Viking sold its four Domino's franchises in fall of 2016 for reasons unrelated to the accident. (Kuone Dep. (Doc. 56) at 52.) Viking did not buy any other franchises or engage in any other business after that sale. (Id. at 52–53.)

Dilthey filed suit against Viking and Kearse in state court on November 30, 2016. (Pl.'s Br. (Doc. 63) Ex. Q, Process in Underlying Lawsuit ("Service") (Doc. 63-17) at 3.) On the same day, Dilthey mailed the summons, complaint, discovery materials, and a cover letter to Viking at the 305 Chastain Court address. (Id. at 2.) The documents were sent via registered mail, return receipt requested. (Id.) Shonda Kuone, Steven Kuone's wife, signed for the documents. (Shonda Kuone Dep. (Doc. 59) at 71.) Shonda Kuone noted that she would regularly sign for Viking mail sent to 305 Chastain Court, and that she would place it in one of two places where Steven Kuone would work. (Id. at 11–12, 16.) Steven Kuone was in the habit of looking at mail left for him in those locations. (Kuone Dep. (Doc. 56) at 89–90.) Shonda Kuone also stated that there was a period of time in 2016 and 2017 where Steven Kuone was not living at 305 Chastain Court and that there were time frames when the two of them would not speak.

(Shonda Kuone Dep. (Doc. 59) at 17; Kuone Dep. (Doc. 56) at 27-29.) Steven Kuone did not recall ever seeing the Underlying Lawsuit's process papers. (Kuone Dep. (Doc. 56) at 88.)

After serving process on Viking, Dilthey still received no response. (Dilthey Dep. (Doc. 58) at 51.) Though Viking was technically in default, Dilthey did not move for an entry of default. (Pl.'s Br. (Doc. 63) Ex. W, Penn National Claim Notes ("Claim Notes") (Doc. 63-23) at 2.) To elicit a response from Viking, Dilthey subpoenaed both Kuones for a deposition to take place on April 11, 2017. (Dilthey Dep. (Doc. 58) at 52.) Dilthey used a private investigator at a cost of "60 bucks" to physically hand Kuone his subpoena for the deposition. (Id. at 95-96.)

## F. April 11, 2017 Deposition and Notice to Penn National

On April 10, 2017, the day before the deposition, Kuone contacted the Upton Insurance Group and sent the summons, complaint, and discovery documents for the suit against Viking. (Doc. 63-20.) Upton then forwarded that information to Penn National, which Penn National received on April 11, 2017, at 11:00 a.m. EST. (Deposition of Gary R. Gibson ("Gibson Dep.") (Doc. 57) at 66.) Upton emailed the wrong email address, but Penn National eventually received all the documents. (Id. at 66-67.)

-9-

Both Kuones were present for Dilthey's deposition on April 11, 2017. (Dilthey Dep. (Doc. 58) at 55.) At some point during the deposition, but off the record, Dilthey asked Steven Kuone why he was not responding to Dilthey's letters. As Dilthey put it,

> I said to him, why are you not getting up with me about this. And he said, because I don't own the company. I have sold the company. And his whole fixation as to why this was happening was, he was convinced that, since he was not the owner of the company when the papers were being served, he didn't feel that he had any responsibility to do anything.

(Id. at 84.) Dilthey said that was Steven Kuone's "excuse" for "not following up on letters or subpoenas." (Id. at 84-85.) Dilthey further stated that Steven Kuone was "convinced" that since Viking had sold the franchises, he was no longer involved. (Id. at 95.) Kuone does not remember these conversations with Dilthey. (Kuone Dep. (Doc. 56) at 95.) When Gary Gibson, Penn National's Federal Rules of Civil Procedure 30(b) designee, was asked if the fact that Viking did not own the franchises anymore was a complicating factor in the Underlying Lawsuit, he responded "I guess, yes." (Gibson Dep. (Doc. 57) at 125.)

At the April 11, 2017 deposition, Kuone called and spoke with Candace Leatherberry with Penn National. (Id. at 81-82.) As Kuone put it, he called to see if he could get an "assist" with

-10-

the deposition. (Kuone Dep. (Doc. 56) at 51.) As Kuone also
stated,

> [Kuone]: I was looking for assistance. I don't
> remember – that's – might be the origin of why I
> called the Upton insurance agency.
>
> Q.   Okay. To get assistance with the lawsuit?
>
> [Kuone]: Yeah, to see if – if there was anything that
> could be done, seeing that the transaction had already
> taken place and the stores were already sold.

(Id. at 37.)

After the April 11, 2017 deposition, Viking did not respond
to any of Penn National's communications. (Pl.'s Br. (Doc. 63)
at 7-8.)[2] Penn National sent numerous communications to Viking,
to include calling Kuone at the proper phone number, emailing
the email address Kuone used, and mailing letters to 305
Chastain Court. (Doc. 63-1 at 27, 30, 33; see generally Claim
Notes (Doc. 63-23).) Steven Kuone himself signed for one
reservation of rights letter Penn National sent on June 13,
2017. (Pl.'s Br. (Doc. 63) Ex. Y, June 13, 2017 Penn National
Letters ("Penn National Letters") (Doc. 63-25) at 2; Kuone Dep.
(Doc. 56) at 49.) Penn National sometimes uses investigators to
reach unresponsive persons, but it decided to not use in-person
service to reach Kuone. (Gibson Dep. (Doc. 57) at 8-9, 126.)

---

[2] Defendants do not dispute this assertion.

-11-

## G. **Default Judgment in Underlying Lawsuit**

In light of its difficulties reaching Viking, Penn National sent Viking several reservation of rights letters pending further inquiry about coverage issues. (See generally Penn National Letters (Doc. 63-25).) After Kuone's April 11, 2017 deposition, Dilthey made efforts to get Penn National involved in the Underlying Lawsuit. (Dilthey Dep. (Doc. 58) at 98-99.) Dilthey sent initial information to Penn National; Dilthey also stated that he would have "done anything" to get Penn National involved. (Id. at 98.) Dilthey would have given his additional witness information to Penn National "without discovery." (Id. at 100.) Gibson asserts that Penn National "would have preferred" to have their own investigators interview witnesses and examine the accident scene. (Gibson Dep. (Doc. 57) at 157.) The Claim Notes do not mention this as a factor in why the tort action might be difficult to defend. (Id. at 155.) Dilthey continued to try and get Penn National involved throughout Spring 2017, but in May 2017, the Claim Notes state that "Gary [Gibson] does not suggest we follow up with the plaintiff atty at this time." (Claim Notes (Doc. 63-23) at 5.)

Dilthey gave Penn National until July 4, 2017, to defend the case, but actually delayed entry of default until August 30, 2017. (Gibson Dep. (Doc. 57) at 144-45.) A bench trial was held

-12-

in December 2017; on December 15, 2017, the trial judge in the Underlying Lawsuit found Viking liable and entered judgment against Viking in the amount of $100,000.00 for Irving and $4,526,607.28 for Harrington. (Pl.'s Br. (Doc. 63) Ex. H, Default Judgment (Doc. 63-8) at 2.) This amount was derived, in large part, from a "life care" notebook that Dilthey and Bell produced for Harrington. (Dilthey Dep. (Doc. 58) at 85–86.)

## H.   **Procedural History**

Penn National filed this declaratory judgment action on December 28, 2017. (Complaint (Doc. 1).) Penn National filed an amended complaint on January 15, 2019, (Am. Compl. (Doc. 22)),[3] and Defendants Irving and Harrington filed their answer and counter-claims on January 29, 2019, (Answer (Doc. 23)). Penn National did not demand a jury, but Irving and Harrington did. (Am. Compl. (Doc. 22); Answer (Doc. 23) at 19.) Defendants Kearse and Viking have not entered appearances in this action. Following discovery, Irving and Harrington filed their present Motion for Summary Judgment and a supporting brief. (Docs. 54, 55.) Penn National responded, (Doc. 64), and Defendants replied,

---

[3] Penn National, in its Amended Complaint, also asks for a declaration that Kearse was not an "insured" under Viking's policies. (Am. Compl. (Doc. 22) at 40.) That issue is not addressed in Penn National's briefing. (See Pl.'s Br. (Doc. 63) at 10–11.) Therefore, that issue is not now addressed by the court.

(Doc. 66). Penn National also filed its own Motion for Summary Judgment and a supporting brief. (Docs. 62, 63.) Defendants Irving and Harrington responded, (Doc. 65), and Penn National replied, (Doc. 67). Both motions for summary judgment are ripe for ruling. For the reasons stated herein, the court will deny both motions.[4]

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). The moving

---

[4] In its Amended Complaint, Penn National asks for a declaration that Kearse was not an "insured" under Viking's policies. (Am. Compl. (Doc. 22) ¶¶ 106–08.) However, Penn National did not move for summary judgment on its Fourth Request for Declaratory Judgment. (<u>See</u> Doc. 62.) Harrington and Irving do move for summary judgment on the issue of whether Kearse was an insured, one of their own requested declarations, but they do not provide any argument on that point in their briefing. (<u>See</u> Doc. 54 ¶ 2; <u>see generally</u> Defs.' Br. (Doc. 55).) Harrington and Irving briefly mention the issue in their response to Penn National's Motion for Summary Judgment, (Defs.' Resp. (Doc. 65) at 2 n.1), but not in a way that substantively advances the argument. Therefore, in this opinion, the court does not address any issues involving Kearse's status under Viking's insurance policies.

-14-

party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "In satisfying this burden, the nonmoving party must support the asserted claims with evidence that is significantly probative." Young v. Prince George's Cty., 355 F.3d 751, 755 (4th Cir. 2004); Hit Prods. Corp. v. Anchor Fin. Corp., 215 F.3d 1318 (4th Cir. 2000). The nonmoving party's failure to set forth such evidence renders summary judgment appropriate. Young, 355 F.3d at 755 (quoting Barwick v. Celotex Corp., 736 F.2d 946, 958-59 (4th Cir. 1984)). Summary judgment should be granted "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247-48).

When facing cross-motions for summary judgement, this court reviews "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)

(citations and internal quotation marks omitted). "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (citation and internal quotation marks omitted).

### III. ANALYSIS OF PENN NATIONAL'S MOTION FOR SUMMARY JUDGMENT

The court begins by analyzing Penn National's Motion for Summary Judgment. (Doc. 62.) Penn National claims that Viking breached the notification and cooperation provisions of its insurance contracts. (See Auto Policy (Doc. 22-1) at 24; Umbrella Policy (Doc. 22-2) at 37–38.) Therefore, Penn National argues, they should be legally absolved from indemnifying Viking in the Underlying Lawsuit.

On the failure to notify claim, Penn National argues that Kuone, as Viking's sole officer, acted in bad faith in failing to notify Penn National about the 2014 accident until April 2017. First, Penn National argues that since Kuone indisputably knew about the accident but did not report it, he acted with bad faith as a matter of law. (Pl.'s Br. (Doc. 63) at 15.) Penn National also argues that Kuone acted in bad faith when he failed to notify Penn National after Dilthey served the suit papers in November 2016. (Id. at 16.) Penn National argues that

-16-

Kuone's failure to follow up on the numerous letters also qualifies as bad faith as a matter of law. (Id. at 16–17.) Since Penn National could not investigate the accident in 2014, Penn National claims it was materially prejudiced by the delay in notification. (Id. at 17–19.)

Regarding Kuone's alleged failure to cooperate, Penn National argues that Kuone breached his duty to cooperate when he failed to respond to their numerous communications sent to the proper addresses and phone number. (Id. at 20–21.) As for prejudice resulting from Kuone's failure to cooperate, Penn National's only argument is that since they could not contact Kuone, they could not have retained counsel to represent Viking, even if they decided to do so. (Id. at 21.)

Since there are genuine issues of material fact regarding Viking's subjective good faith and any prejudice to Penn National from the late notice of lack of cooperation by Viking, this court finds that Penn National's Motion for Summary Judgment should be denied.[5]

---

[5] The court feels the need to emphasize from the beginning that it is not blind to the fact that Viking, through Kuone, behaved in a manner that is, at the very least, arguably negligent. At worst, Viking did act in bad faith. Still, this inquiry cannot be resolved at this stage in light of Kuone's own statements and explanations.

A.   **Duty to Notify**[6]

"In resolving this diversity action, we are obliged to apply the substantive law of North Carolina." Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197 (4th Cir. 2005).[7]

To determine if an "insurer may be relieved of its obligation to indemnify due to its insured's asserted failure to comply with a policy requirement that notice of loss be given to the insurer 'as soon as practicable,' North Carolina utilizes the test enunciated in its Supreme Court's Great American decisions." Id. at 197–98 (citing Great Am. Ins. Co. v. C.G. Tate Constr. Co. (Great American I), 303 N.C. 387, 279 S.E.2d

_____

    [6] The Auto Policy requires the insured, in the event of an "accident" or "suit," to give Penn National or an "authorized representative prompt notice of the" the accident or claim. (Auto Policy (Doc. 22-1) at 24.) An insured must also "[i]mmediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or 'suit.'" (Id.) The Umbrella Policy also contains a notice provision, requiring the insured to "see to it that [Penn National is] notified as soon as practicable" of a claim. (Umbrella Policy (Doc. 22-2) at 37–38.) Further, if a claim or suit is brought against an insured, the insured must "see to it that [Penn National] receive[s] written notice of the claim or 'suit' as soon as practicable." (Id.)

    [7] The parties do not dispute that North Carolina law applies. (See Defs.' Br. (Doc. 55) at 21; Pl.'s Br. (Doc. 63) at 12.)

-18-

769 (1981); <u>Great Am. Ins. Co. v. C.G. Tate Constr. Co.</u> (<u>Great</u> <u>American II</u>), 315 N.C. 714, 340 S.E.2d 743 (1986)).

In <u>Great American I</u>, the North Carolina Supreme Court "redefined the 'notice as soon as practicable' provision to mean that the requirement is satisfied despite any delay in notifying the insured, so long as it is occasioned in good faith <u>and</u> the insurer is not materially prejudiced." <u>Great American II</u>, 315 N.C. at 719, 340 S.E.2d at 747. The "<u>Great American</u> test" includes three prongs:

> (1) whether there was a delay in notifying the insurer of a covered loss (the "Notice Element"); (2) if such notice was delayed, whether the insured acted in good faith with respect to the delay (the "Good Faith Element"); and (3) if the insured acted in good faith, whether the insurer was nevertheless materially prejudiced by the delay (the "Prejudice Element").

<u>Metric/Kvaerner Fayetteville</u>, 403 F.3d at 197-98 (citing <u>Great</u> <u>American II</u>, 315 N.C. at 718-19, 340 S.E.2d at 746-47).

The first prong of the test is relatively straightforward. "[I]n most instances, unless the insurer's allegations that notice was not timely are patently groundless, the first part of the test is met by the fact that the insurer has introduced the issue to the court." <u>Pa. Nat'l Mut. Cas. Ins. Co. v. JJA</u> <u>Constr., Inc.</u>, Civil Action No. 3:18-CV-00266-GCM, 2019 WL 2241685, at *4 (W.D.N.C. May 23, 2019) (quoting <u>Great American</u> <u>II</u>, 315 N.C. at 719, 340 S.E.2d at 747). "How much time must

-19-

pass between the occurrence and notice before the period is determined to be a 'delay' is a question of law for the court." Great American II, 315 N.C. at 719 n.3, 340 S.E.2d at 747 n.3.

The parties do not dispute that the first prong is met for purposes of this motion. (Defs.' Br. (Doc. 55) at 22; Pl.'s Br. (Doc. 63) at 4 n.2). With no dispute between the parties that the first Great American prong is satisfied, and the parties appear to rely on April 10, 2017, as the date of notification, the court turns to the next two prongs: good faith and prejudice. The court notes that April 10, 2017, is thirty months after the September 14, 2014 accident, but sixteen months after the Bell Letter was sent.

### 1. **Good Faith Prong**

The burden is on the insured to show they acted in good faith. St. Paul Reinsurance Co. v. Rudd, 67 F. App'x 190, 194 (4th Cir. 2003); see Great American I, 303 N.C. at 399, 279 S.E.2d at 776. On the "good faith prong," Great American I held that "[a]nyone who knows that he may be at fault or that others have claimed he is at fault and who purposefully and knowingly fails to notify ought not to recover even if no prejudice results." Great American I, 303 N.C. at 399, 279 S.E.2d at 776 (emphasis added). As later expounded by the Great American II court, the second prong is composed of two questions: "1) Was

-20-

the insured aware of his possible fault, and 2) [d]id the insured purposefully and knowingly fail to notify the insurer?" Great American II, 315 N.C. at 720, 340 S.E.2d at 747. The good faith test is conjunctive. Id.

Both good faith questions ask, "not what a reasonable person in the position of the insured would have known, but what the insured actually did know." Id. Further, "the test . . . is not simply whether [an insured] knew of its potential liability." Pulte Home Corp. v. Am. S. Ins. Co., 185 N.C. App. 162, 174, 647 S.E.2d 614, 622 (2007). Rather, there must be evidence "suggesting a purposeful, intentional, or deliberate decision by [the insured] to delay notification . . . ." Id. at 175, 647 S.E.2d at 622. Delays in reporting that result from faulty or negligent reporting systems are not bad faith delays, Duke Univ. v. St. Paul Mercury Ins. Co., 95 N.C. App. 663, 678, 384 S.E.2d 36, 45 (1989), nor are negligent mistakes by the insured himself, St. Paul Reinsurance Co., 67 F. App'x at 196–97. The Great American II court offered several examples of what would and would not qualify as a good faith delay, including the following:

> [W]here the insured simply negligently forgets to
> report the accident, there is knowledge, but there is
> no knowing, purposeful failure to notify the insurer.
> But where the insured does not think he is involved
> but knows that claims might be filed against him, and
> he fails to notify the insurer because of that

-21-

> uncertainty, then there is both actual knowledge of
> possible liability and there is a knowing and
> purposeful decision not to inform the insurer.

Great American II, 315 N.C. at 721, 340 S.E.2d at 748 (emphasis

added). Further, if an insured "had no actual awareness of any

accusation that he might be liable, then his failure to notify,

though deliberate, is in good faith." Id. at 720, 340 S.E.2d at

747 (emphasis added).

Specifically discussing the "good faith prong" of the Great

American test, the North Carolina Supreme Court has noted that

"summary judgment is rarely appropriate in actions in which the

litigant's state of mind, motive, or subjective intent is an

element of plaintiff's claim." Liberty Mut. Ins. Co. v.

Pennington, 356 N.C. 571, 580, 573 S.E.2d 118, 124-25 (2002)

(internal quotations and citations omitted).[8]

---

[8] Of course, "it has repeatedly been held that federal
procedural standards govern whether summary judgment is
appropriate in any case." Util. Control Corp. v. Prince William
Constr. Co., 558 F.2d 716, 720 (4th Cir. 1977). The court cites
the language from Pennington only to underscore the point that
subjective state of mind is often an inappropriate question for
resolution on summary judgment when analyzing an insured's good
faith under Great American. Federal courts regularly decline to
resolve issues of intent or subjective good faith on summary
judgment. See, e.g., Morrison v. Nissan Co., 601 F.2d 139, 141
(4th Cir. 1979); Croley v. Matson Navigation Co., 434 F.2d 73,
77 (5th Cir. 1970); St. Paul Reinsurance Co., 67 F. App'x at 196
(citing Pennington with approval); In re Jenkins, No. 3:12-cv-
851-RJC, 2013 WL 4805731, at *6 (W.D.N.C. Sept. 6, 2013)
(Footnote continued)

> [W]hen the disposition of a case turns on a
> determination of intent, courts must be especially
> cautious in granting summary judgment, since the
> resolution of that issue depends so much on the
> credibility of the witnesses, which can best be
> determined by the trier of facts after observation of
> the demeanor of the witnesses during direct and cross-
> examination.

Morrison v. Nissan Co., 601 F.2d 139, 141 (4th Cir. 1979).

Kuone was Viking's only officer. At issue is whether he was "aware of his possible fault" or, once aware, if he purposefully and knowingly failed to notify Penn National. In dealing with those issues, Penn National relies on different evidence that develops over three periods: (1) the moment Kuone was made aware of the accident on September 14, 2014, to the mailing of the Bell Letter on December 16, 2015; (2) the mailing of the Bell Letter in December 2015 to the mailing of the Underlying Lawsuit's process papers in November/December 2016; and (3) the service of the lawsuit papers in December 2016 to the notice finally given to Penn National on April 11, 2017. "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational

---

("Summary judgment is generally not appropriate for the disposition of a fraudulent transfer claim based on actual intent because the debtor's subjective intent is at issue." (quoting Allman v. Wappler (In re Cansorb Indus. Corp.), No. 07-6072, 2009 WL 4062220, at *9 (Bankr. M.D.N.C. Nov. 20, 2009))).

-23-

inferences in the light most favorable to the party opposing that motion." Rossignol, 316 F.3d at 523 (internal citation omitted).

Starting with the first period, there is a genuine dispute of material fact about whether Viking "purposefully and knowingly fail[ed] to notify the insurer." Great American II, 315 N.C. at 720, 340 S.E.2d at 747. Although the parties do not dispute the fact that no notice was given to Penn National in 2014, (Defs.' Br. (Doc. 55) at 22), Kuone testified that he "absolutely" contacted the insurance agency after the accident, (Kuone Dep. (Doc. 56) at 22). Later, Kuone stated that he did not "have any specific recollection" of reporting the accident, but instead he did "remember the process," and the process included notifying the insurer. (Id. at 82–83.) Kuone further stated that he did not "intentionally decide to not follow [his] standard [reporting] practice for this accident." (Id. at 104.) Finally, Kuone noted that his recollection of the process he would have followed was "not speculation." (Id. at 21.) Even if the parties agree no notice was given, this testimony creates an issue of fact as to whether Kuone purposefully and knowingly failed to notify Penn National in 2014. The jury could find from Kuone's testimony that he did notify Penn National, or that he tried and failed to notify Penn National as a result of faulty

-24-

reporting systems,[9] conclusions that create an issue of fact. "[W]here the insured simply negligently forgets to report the accident, there is knowledge, but there is no knowing, purposeful failure to notify the insurer." Great American II, 315 N.C. at 721, 340 S.E.2d at 748; see also Duke Univ., 95 N.C. App. at 678, 384 S.E.2d at 45 (noting that a faulty reporting system "may be unwise or negligent, [but] reliance on that system does not constitute a deliberate failure to notify the insurer under Great American II"). Therefore, this court cannot say, as a matter of law, that Viking acted in bad faith from the time of the accident in September 2014 until the Bell Letter was mailed in December 2015.

The second relevant time period is from the time the Bell Letter was mailed in December 2015 until Dilthey mailed the suit papers in November 2016. Penn National contends that the Bell Letter was mailed in 2014, and that the letter put Viking and Kuone on renewed notice that Viking was "at fault or that others have claimed [it was] at fault . . . ." Great American I, 303 N.C. at 399, 279 S.E.2d at 776. During this time period there is

---

[9] This is not an unfathomable conclusion in light of the fact that Viking was losing its franchises because of multiple errors in other areas of operations. (Kuone Dep. (Doc. 56) at 86–87.)

a genuine issue of material fact as to Viking's knowledge of the Underlying Lawsuit.

There is no dispute that Julie Bell mailed a letter to 305 Chastain Court on December 16, 2015. (Bell Letter (Doc. 63-14) at 2.) That letter also included a copy of the accident report generated by the Raleigh Police Department following the accident, but did not use the words "suit," "claim," or a synonym. (Id.) The letter did request that Viking have its insurance carrier contact the law firm directly. (Id.) 305 Chastain Court was the appropriate address for Viking Pizza, Inc. (Viking Info (Doc. 63-2).) Despite this, Kuone testified that he was "sure" he did not remember seeing the Bell Letter before his 2019 deposition. (Kuone Dep. (Doc. 56) at 25.)

"Evidence of the deposit in the mails of a letter, properly stamped and addressed, establishes prima facie that it was received . . . ." Wilson v. Claude J. Welch Builders Corp., 115 N.C. App. 384, 386, 444 S.E.2d 628, 629 (1994). "Evidence of nonreceipt of the letter by the addressee or by his agent, is some evidence that the letter was not mailed and raises a question of fact for the trier of fact." Id. As the Fourth Circuit noted in Benner v. Nationwide Mutual Insurance Co., 93 F.3d 1228 (4th Cir. 1996),

> [w]hile the presumption may be rebutted so as to
> create a question of fact, testimony by the addressee

-26-

> that he . . . does not remember receiving[] the
> material is not conclusive. The trier of fact should
> consider that proof along with all of the other
> evidence offered in the case to determine whether the
> item was mailed and received.

Id. at 1234–35.[10]

Kuone's testimony that he does not recall seeing the Bell Letter is some evidence of whether Viking received the letter, though it is not conclusive. Furthermore, the Bell Letter was sent via regular mail, (Dilthey Dep. (Doc. 58) at 48–49), and, according to the evidence, during December 2015, Kuone, Viking's only officer, was not at 305 Chastain Court as often due to his ongoing business around Wake County, where he also had an apartment, (Kuone Dep. (Doc. 56) at 29). These facts, along with Kuone's testimony that he was "sure" he did not see the letter, (id. at 25), make receipt of the Bell Letter uncertain enough to create a genuine issue of fact for the jury. The Bell Letter therefore cannot, as a matter of law, serve as evidence of Kuone and Viking's knowledge that Viking was at fault or others claimed it was at fault.

The third period spans from November 30, 2016, the date Dilthey mailed the process papers and interrogatories in the

---

[10] Though interpreting Maryland law, Maryland has a mailbox presumption similar to North Carolina's, and therefore the logic in Brenner seems to apply to North Carolina's mailbox presumption.

Underlying Lawsuit, to April 11, 2017, when Penn National received notice. Again, the good faith inquiry is two part: "1) [w]as the insured aware of his possible fault, and 2) [d]id the insured purposefully and knowingly fail to notify the insurer?" Great American II, 315 N.C. at 720, 340 S.E.2d 747.

Penn National contends that the facts during this timeframe establish Kuone's, and thus Viking's, knowledge that others claimed they were at fault. First, Dilthey served process on Kuone at 305 Chastain Court by registered mail, return receipt requested. (Shonda Kuone Dep. (Doc. 59) at 71.) Kuone's wife, Shonda, signed for the papers on December 1, 2016. (Id.) However, Kuone testified he did not recall ever seeing the documents. (Kuone Dep. (Doc. 56) at 88.) The facts submitted show that Shonda Kuone signed for the papers during a time when Steven Kuone was not living at 305 Chastain Court and when the two of them would go periods of time without speaking. (Id. at 88-89; Shonda Kuone Dep. (Doc. 59) at 17.) Also, the record indicates that by November 30, 2016, Viking had sold all its Domino's franchises, making it more reasonable to infer that Kuone would ignore mail addressed to Viking, as the evidence suggests. Steven Kuone stated there were periods of time after he sold the franchise where he might not have seen mail addressed to Viking. (Kuone Dep. (Doc. 56) at 28.)

-28-

Steven Kuone did see the process papers at some point prior to April 17, 2017;[11] the record supports the inference that Steven Kuone did not see the process papers until March 16, 2017. On that date, Steven and Shonda were subpoenaed, by an in-person process server, to appear for the April 11, 2017 deposition. (Shonda Kuone Dep. (Doc. 59) at 53, 67; Dilthey Dep. (Doc. 58) at 96–97.) Steven Kuone indicated he probably did not see the process papers until close to his 2017 deposition. (Kuone Dep. (Doc. 56) at 28–29.) Shonda's recounting supports this inference. Shonda Kuone stated that she had not actually looked through the process papers until she and Steven were personally served with the subpoenas for the April 2017 deposition. (Shonda Kuone Dep. (Doc. 59) at 59.) After they were served with the subpoenas, Steven "brought [the process papers] to [her] attention" and she then "started looking through the paperwork." (Id.) Though it is not Shonda Kuone's knowledge of a claim that matters, her testimony indicates that Steven did not see and/or understand the process papers until he was subpoenaed on March 16, 2017. The in-person service of the subpoena was

_____

[11] Dilthey's recounting of his conversation with Steven Kuone on that day supports this conclusion; Kuone implied to Dilthey that he had seen the papers prior to arriving for the deposition, but that he did not think he needed to respond. (See Dilthey Dep. (Doc. 58) at 84.)

-29-

also the only communication that is objective evidence of Steven Kuone's knowledge of the Underlying Lawsuit, evidence supported by the record of personal service and Kuone's actions in response. (Dilthey Dep. (Doc. 58) at 96-97.) Though there are adverse inferences that can be drawn against Kuone from the fact that he did not respond until he was served in person, the inference in favor of Defendants is that he responded because he was finally made aware of the claim and pending suit.

The finder-of-fact is free to evaluate credibility and could find, from this evidence, multiple instances in which Kuone had actual knowledge of an asserted claim; however, viewing the record in a light most favorable to Defendants, there is evidence from which a jury could find that Steven Kuone did not have actual knowledge of a claim, or that one was asserted, until March 16, 2017. As a matter of law and for purposes of summary judgment, the undisputed facts permit this court to find that Kuone had knowledge within the meaning of Great American I and II as of March 16, 2017.[12] He then waited a month to notify Penn National on April 17, 2017. This is a time

_____

[12] The court is referring to when Kuone was aware of the Underlying Lawsuit and associated insurance claim. There is no dispute Kuone was aware of Kearse's accident soon after it occurred in 2014. Again, the genuine dispute during that initial period is whether Kuone purposefully and knowingly failed to notify Penn National.

-30-

period shorter than other bad faith delays. See, e.g., Kubit v. MAG Mut. Ins. Co., 210 N.C. App. 273, 298, 708 S.E.2d 138, 156 (2011) (finding an unexplained delay of over eight months to have been in bad faith).[13] The court cannot conclude, as a matter of law, that a delay of one month is one made in bad faith.

In addition to the limited period of delay, the material and undisputed facts include Kuone's own statements about his

---

[13] There is also evidence supporting the inference that Kuone may not have understood he, as Viking's only officer, was actually facing a claim even after he saw the process papers. As the Great American II court pointed out, an insured who "had no actual awareness of any accusation that he might be liable, then his failure to notify, though deliberate, is in good faith." Great American II, 315 N.C. at 720, 340 S.E.2d at 747 (emphasis added). Dilthey spelled out Kuone's thinking on this point when he paraphrased his conversation with Kuone about why it had been difficult for Dilthey to reach him:

> I said to him, why are you not getting up with me about this. And he said, because I don't own the company. I have sold the company. And his whole fixation as to why this was happening was, he was convinced that, since he was not the owner of the company when the papers were being served, he didn't feel that he had any responsibility to do anything.

(Dilthey Dep. (Doc. 58) at 84.) Based on Dilthey's testimony about his conversation with Kuone, Kuone did not believe he was facing any suit, because he had effectively sold Viking when Viking sold the franchises. The suit was against Viking Pizza, Inc., not Kuone. (Service (Doc. 63-17) at 3.) In Dilthey's words, Kuone "was convinced, [that since he] sold the corporation," he was not involved. (Dilthey Dep. (Doc. 58) at 95.) The record suggests that Kuone, assuming he was aware there was a suit against Viking, believed that the fact Viking sold the franchises removed him from the situation.

confusion leading up to the point where he provided notice, further suggesting that any delay was not purposeful and knowing. An insured's confusion about the availability of coverage can lead to a good faith delay — in Duke University v. St. Paul Mercury Insurance Co., a delay of roughly eleven months was found to be in good faith because the insured did not believe a claim, one involving complex legal issues, was covered by a particular policy. 95 N.C. App. at 667, 678, 384 S.E.2d at 38-39, 45.[14] By contrast, delay without reason is not in good faith, Kubit, 210 N.C. App. at 298, 708 S.E.2d at 157, nor is a delay made to avoid adverse results, Digh v. Nationwide Mut. Fire Ins. Co., 187 N.C. App. 725, 731, 654 S.E.2d 37, 41 (2007). In this case, the record supports the inference that Kuone was confused about whether Viking still had coverage since Viking had sold the franchises, (Kuone Dep. (Doc. 56) at 37; Gibson Dep. (Doc. 57) at 125), creating a genuine issue of whether he "purposefully and knowingly fail[ed] to notify the insurer[,]" Great American II, 315 N.C. at 720, 340 S.E.2d 747.[15]

---

[14] An additional period of delay in that case was excused for Duke's claim reporting systems.

[15] Viking continued to exist as a corporation after it sold the franchises, but, as Kuone stated, Viking did not engage in any other business. (Kuone Dep. (Doc. 56) at 52-53.)

-32-

Viewing the evidence in a light most favorable to
Defendants, there are genuine disputes as to material facts
about when Kuone, and thus Viking, received actual notice he
might "be at fault or that others have claimed he is at fault
. . . ." Great American I, 303 N.C. at 399, 279 S.E.2d at 776.
There are also genuine disputes regarding whether Kuone, and
thus Viking, "purposefully and knowingly fail[ed] to notify"
Penn National. Id. Kuone's own testimony about his failure to
notify Penn National creates a genuine issue of material fact on
the good faith prong. While there may be concerns about the
factors alleged by Kearse, see supra, note 5, there are issues
of credibility that this court is not permitted to resolve at
this stage. Viewing the evidence in the light most favorable to
Defendants, "the evidence is such that a reasonable jury could"
find that Kuone acted in good faith. Since the issue is at least
in part one of Kuone's credibility, it cannot be resolved at
this stage. See Morrison, 601 F.2d at 141.

###    2.    **Prejudice Prong**

If the insured shows that his delayed notice was done in
good faith, the burden then shifts back to the insurer to show
that they were materially prejudiced by the delay in notice. St.
Paul Reinsurance Co., 67 F. App'x at 194; Bissette v. Auto-
Owners Ins. Co., 208 N.C. App. 321, 334, 703 S.E.2d 168, 177

-33-

(2010); Pennington, 141 N.C. App. at 500, 541 S.E.2d at 507.
Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 52 F.
Supp. 2d 569, 577 (E.D.N.C. 1999), aff'd sub nom. Wm. C. Vick
Const. Co. v. Great Am. Ins. Co., 213 F.3d 634 (4th Cir. 2000)
("[U]nder the three-step test in Great American I, 'the burden
then shifts to the insurer to show that its ability to
investigate and defend was materially prejudiced by the delay.'"
(quoting Great American I, 303 N.C. at 399, 279 S.E.2d at 776)).

The Great American I court laid out a non-exhaustive list
of factors to consider when determining if an insurer was
prejudiced by a delay in notification:

> [T]he availability of witnesses to the accident; the
> ability to discover other information regarding the
> conditions of the locale where the accident occurred;
> any physical changes in the location of the accident
> during the period of the delay; the existence of
> official reports concerning the occurrence; the
> preparation and preservation of demonstrative and
> illustrative evidence, such as the vehicles involved
> in the occurrence, or photographs and diagrams of the
> scene; the ability of experts to reconstruct the scene
> and the occurrence; and so on.

Great American I, 303 N.C. at 398, 279 S.E.2d at 776 (quoting
Great Am. Ins. Co. v. C. G. Tate Const. Co., 46 N.C. App. 427,
437, 265 S.E.2d 467, 473 (1980), aff'd as modified, 303 N.C.
387, 279 S.E.2d 769 (1981)). "Proof of the existence of any of
the above factors is not determinative; the insurer must also
show that the changed circumstance materially impairs its

-34-

ability to investigate the claim or defend and, thus, to prepare a viable defense." Id. at 398-99, 279 S.E.2d at 776. "Often, proof of the changed circumstance itself will give rise to an inference of prejudice; for example, proof of the unavailability of a sole independent eyewitness." Id. at 399, 279 S.E.2d at 776. The prejudice prong of the Great American test "is not designed to determine whether the insurer has suffered material prejudice in any and all respects. Rather, the prejudice with which [Great American] is concerned is that relative to the ability of the insurer to investigate and defend the claim in question." Pennington, 356 N.C. at 581, 573 S.E.2d at 125.

Penn National has failed to show that it was so prejudiced by the delay as to negate coverage as a matter of law. As Defendants point out, Penn National claims that witnesses were unavailable in 2017, but it fails to cite a specific witness who was not available. (Pl.'s Br. (Doc. 63) at 17-19.) Throughout its Motion for Summary Judgment, Penn National uses conditional language to describe the unavailability of witnesses. "Several witnesses to Kearse's accident would not have been available by the time Penn National could have interviewed them." (Id. at 18.) "Other witnesses may have been interviewed by police or by Dilthey, but could not have been located for an interview in

-35-

April 2017."[16] (Id.) In addition to not naming any specific witnesses, Penn National speculates further that there was a "significant likelihood that the witnesses' testimony would have supported a contributory negligence defense." (Id.) Despite Penn National's insistence that unnamed witnesses could not have been located, the police reports in the accident reconstruction report lists several witnesses. (RPD Report (Doc. 63-6) at 11, 16.) "[T]he unavailability of a sole independent eyewitness" is proof of prejudice. Great American I, 303 N.C. at 399, 279 S.E.2d at 776. Penn National, however, does not cite any of these witnesses as unreachable.

Beyond witnesses, Penn National also points out that it was not able to participate in a May 2016 deposition of Kearse, the driver who struck Harrington. (Pl.'s Br. (Doc. 63) at 18.) Penn National argues that, had counsel for Viking been present, "different or additional testimony could have been elicited," (id. at 18-19), specifically as it pertained to Kearse's recollection of where he was when he first saw Harrington and the other boys in the road. Assuming Penn National is correct, there is nothing that would have prevented them from redeposing

---

[16] Since one of the witnesses was Harrington's younger brother, Defendant Irving would have been useful in finding and speaking with him. (See RPD Report (Doc. 63-6) at 12.)

-36-

Kearse in 2017.[17] Indeed, Dilthey stated he delayed seeking entry of default in order to get Penn National into the case; he did, in fact, wait until August 2017. (Dilthey Dep. (Doc. 58) at 98–99.) Further, Kearse was represented by Nationwide's retained counsel at the deposition, and Penn National does not point to any specific mistake committed by that counsel. (Kearse Dep. (Doc. 63-4) at 2.)

Finally, Penn National argues that they were prejudiced in that they were not able to independently investigate the accident. (Pl.'s Br. (Doc. 63) at 19.) Dilthey stated that the accident reconstruction report done by the Raleigh Police Department was "all anybody would need to evaluate what went on that day." (Dilthey Dep. (Doc. 58) at 38–39.) Dilthey also stated that the accident report was "better than mine ever," despite the fact that Dilthey had been "on the scene for months and almost a year or so." (Id. at 98.) The report was so good

---

[17] Kearse's alleged unavailability in this suit, filed at the end of 2017, does not establish that Kearse was not available in Spring and Summer of 2017 when Penn National first received notice. Further, Penn National knew Kearse still worked at the New Bern Avenue store in April 2017. (Claim Notes (Doc. 63-23) at 8.)

that Dilthey ceased further investigation. (Id. at 39.)[18] The accident report included crash data from Kearse's car, exact distances for when Kearse saw the three pedestrians, reacted, and stopped, seventeen photos of the damage to Kearse's car, and twenty-two photos of the accident scene. (RPD Report (Doc. 63-6) at 18-28, 59, 62-100.)

Finally, Penn National's arguments about prejudice are undercut by their contemporaneous claim notes; the only challenges in the case that Penn National noted at the time were the severity of the injuries and the fact that a lawyer had been retained by Harrington. (Gibson Dep. (Doc. 57) at 154-55.)

Penn National cites no other examples of the prejudice it suffered due to the delay in notice. The court cannot say that, as a matter of law, Penn National was prejudiced by the delay. The prejudice prong of the Great American test "is not designed to determine whether the insurer has suffered material prejudice in any and all respects. Rather, the prejudice with which [Great American] is concerned is that relative to the ability of the insurer to investigate and defend the claim in question." Pennington, 356 N.C. at 581, 573 S.E.2d at 125. Penn National

---

[18] The jury may choose not to believe Dilthey's testimony on this point, since he does have an interest in establishing that Penn National was not prejudiced. However, his bias is not so great as to render his statements incompetent as evidence.

may have suffered some prejudice as a result of the delay, but it still had time and resources to defend "the claim in question." The burden is on the insurer to prove they suffered a "material prejudice" as a result of delayed notification. Penn National has not provided evidence that meets that burden as a matter of law.

### 3.  Conclusion on Failure to Notify

Penn National has failed to show that there is no genuine dispute about material facts underpinning their failure to notify argument and that they are entitled to judgment as a matter of law. For that reason, Penn National's motion will be denied on that claim.

### B.  Duty to Cooperate

There are also genuine issues of material fact on Penn National's duty to cooperate claim.[19]

Cooperation clauses in insurance contracts are generally binding on the parties, and, when "[p]roperly interpreted, they

---

[19] The Auto Policy contains the following cooperation clause: "Duties In The Event Of Accident, Claim, Suit Or Loss . . . b.(3) Cooperate with us in the investigation or settlement of the claim or defense against the 'suit'." (Auto Policy (Doc. 22-1) at 24.) The Umbrella Policy also contains a cooperation clause: "You and any other involved insured must: . . . c.(3) Cooperate with us in the investigation or settlement of the claim or defense against the 'suit' . . . ." (Umbrella Policy (Doc. 22-2) at 37–38.)

will be enforced." Henderson v. Rochester Am. Ins. Co., 254 N.C. 329, 332, 118 S.E.2d 885, 887 (1961); Greco v. Penn Nat'l Sec. Ins. Co., 218 N.C. App. 394, 395, 721 S.E.2d 280, 281 (2012) ("[North Carolina] courts do not follow 'the strict contractual approach when construing cooperation clauses . . . .'" (quoting Great American I)). However, an "insurer will not be relieved of its obligation because of an immaterial or mere technical failure to comply with the policy provisions," rather the "failure must be material and prejudicial." Henderson, 254 N.C. at 332, 118 S.E.2d at 887; see also M.F.A. Mut. Ins. Co. v. Cheek, 34 Ill. App. 3d 209, 213–15, 340 N.E.2d 331, 334–35 (1975) (noting that the material and prejudicial standard, adopted by North Carolina and other states, "is more favorable to insured persons and to accident victims" than a "substantial and material standard"). "The burden of proving material prejudice lies with the insurer." Bissette 208 N.C. App. at 334, 703 S.E.2d at 177; Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 918 F. Supp. 2d 453, 470 (M.D.N.C. 2013).

"[I]t is well settled that, to relieve the insurer of liability on the ground of lack of cooperation, discrepancies in statements by the insured must be made in bad faith and must be material in nature and prejudicial in effect." Henderson, 254 N.C. at 332–33, 118 S.E.2d at 887. Other than cases where the

-40-

insured has taken some affirmative bad faith action, such as colluding with the injured, "courts generally hold the question of materiality and prejudice is a question for the jury." Id. at 333, 118 S.E.2d at 888; see also Greco, 218 N.C. App. at 396, 721 S.E.2d at 282 (noting that North Carolina case law generally holds "that some kind of affirmative action by the insured is required before a court can conclude, as a matter of law, that the insured failed to cooperate"). Though an insured's unavailability may be enough to establish a failure to cooperate, "unavailability is not per se failure to cooperate on the part of the insured." Greco, 218 N.C. App. at 397-98, 721 S.E.2d at 283.

## 1. Penn National's Ability to Defend Underlying Lawsuit

Penn National, in its Motion for Summary Judgment, alleges Viking's failure to cooperate was prejudicial in that "[e]ven if Penn National had hired counsel to defend Viking Pizza, counsel could not have represented Viking Pizza without first getting in touch with Kuone." (Pl.'s Br. (Doc. 63) at 21.) In other words, Penn National argues it was prejudiced because, without Kuone's cooperation, there was no way for them to defend Viking in the Underlying Lawsuit. In support of that assertion, Plaintiff cites to several cases, most prominent of which is Dunkley v. Shoemate, 350 N.C. 573, 515 S.E.2d 442 (1999). Dunkley was

-41-

summarized by a later North Carolina Court of Appeals panel as follows:

> Our Supreme Court in the recent decision of Dunkley v. Shoemate, held "that a law firm or attorney may not represent a client without the client's permission to do so[.]" Dunkley . . . involved an attorney employed by an insurance carrier who attempted to contact the insured without success and therefore was not authorized to appear on his behalf and defend the lawsuit. The Supreme Court affirmed this Court's ruling that no attorney-client relationship existed between defendant and the attorney seeking to represent him.

Morin v. Sharp, 144 N.C. App. 369, 372, 549 S.E.2d 871, 873 (2001) (internal citations omitted). Dunkley, however, also noted that an insurer can often intervene under North Carolina Rule of Civil Procedure 24(a). Id. Under that rule, a

> prospective intervenor seeking such intervention as a matter of right under Rule 24(a)(2) must show that (1) it has a direct and immediate interest relating to the property or transaction, (2) denying intervention would result in a practical impairment of the protection of that interest, and (3) there is inadequate representation of that interest by existing parties.

Virmani v. Presbyterian Health Servs. Corp., 350 N.C. 449, 459, 515 S.E.2d 675, 683 (1999).

Morin dealt with an insurer who was unable to locate two insured parties in a pending lawsuit. Morin, the plaintiff, had been injured by Sharp, a truck driver, while Morin was riding his motorcycle. Sharp was an employee of U.S. Transport. Both Transport and Sharp were insured by Legion Insurance Company.

-42-

Legion Insurance did not receive notice of Morin's tort suit until after a default had been entered against Sharp and Transport. Once Legion received notice of the default, it retained counsel who moved to set aside the default. Morin consented, and counsel proceeded to defend the action. However, counsel "was unable to locate [Sharp or Transport]." Morin, 144 N.C. App. at 371, 549 S.E.2d at 872. Both Morin and Legion filed motions to allow Legion to intervene, which the trial court granted. A jury later returned a sizeable verdict for Morin, and Sharp[20] and Legion appealed.

Among its arguments on appeal, Legion argued that it intervened because it was "being forced" to do so in order to avoid a default judgment against its insured. Id. at 372, 549 S.E.2d at 873. Legion also argued that "such intervention would prejudice defendant Legion, as issues of insurance coverage and the availability of insurance would be improperly raised during the trial." Id. The Court of Appeals disagreed. Citing Dunkley, the court noted that though Dunkley held a lawyer cannot represent a client with whom she has no contact, the Dunkley court also pointed out that North Carolina Rule of Civil

---

[20] Though the opinion does not explain when counsel found Sharp, he was apparently eventually located, since he took part in the appeal. Morin, 144 N.C. App. at 371, 549 S.E.2d at 872. Defendant U.S. Transport was not located. See id.

-43-

Procedure 24 allows an interested party, under certain circumstances, to intervene in a lawsuit so that it can protect its own interests. Id. With that, the Morin court held that the trial court correctly granted the "motions to allow defendant Legion to intervene as a party defendant to protect its interests as articulated in Dunkley," because the court "fail[ed] to see how defendant Legion was forced to intervene or was prejudiced by this intervention." Id. at 372-73, 549 S.E.2d at 873.[21]

Taking the facts in the light most favorable to Defendants, the prejudice that Penn National asserts resulted from Kuone's

---

[21] North Carolina's own preclusion law underscores the propriety of an insurer intervening in situations similar to Morin and the one at bar. In the case of a properly-informed insurer who is also a proper third-party intervenor, North Carolina follows the general rule that

> when [an] insurer is later sued by the injured person, if the insurer had a right to defend the action against the insured, had timely notice of such action, and defends or elects not to defend, the judgment in such case, in the absence of fraud or collusion, is generally binding upon the insurer as to issues which were or might have been litigated therein.

State Farm Fire & Cas. Co. v. Garrity, 785 F.2d 1225, 1226-27 (4th Cir. 1986) (quoting Strickland v. Hughes, 273 N.C. 481, 487, 160 S.E.2d 313, 318 (1968)). As these sources show, an insurer with a duty to defend takes a risk when they elect not to defend, and it is not a risk that is attributable to the insured absent collusion, fraud, or failure to notify.

-44-

lack of cooperation after April 11, 2017, is speculative. As demonstrated by Morin, Penn National did not need Kuone to respond in order to defend Viking in the Underlying Lawsuit. Penn National meets all three criteria listed by the Virmani court for intervention under North Carolina Rule of Civil Procedure 24(a)(2). Penn National could have defended the Underlying Lawsuit without Viking, so Kuone's recalcitrance is not the source of any prejudice when it comes to an alleged inability to defend.[22]

Penn National was also in a better position compared to the insurer in Morin. Kuone, though unresponsive, could be found. It took in-person service to find him, but he could be contacted at relatively low cost.[23] (Dilthey Dep. (Doc. 58) at 96-97.) Second,

---

[22] Penn National cites Pennsylvania National Mutual Casualty Insurance Co. v. JJA Construction, Inc., Civil Action No. 3:18-CV-00266-GCM, 2019 WL 2241685 (W.D.N.C. May 23, 2019), as support for the proposition that complete unavailability equates to a failure to cooperate. (Pl.'s Br. (Doc. 63) at 20-21.) The court is not persuaded. First, Kuone was not completely unavailable, as is evidenced by Dilthey's ability to reach him. Second, JJA Construction conducted a Great American failure-to-notify analysis, not a strict failure-to-cooperate analysis. The two tests are not the same. See Great American I, 303 N.C. at 393 n.2, 279 S.E.2d at 773 n.2.

[23] This is another distinguishing fact between this case and Dunkley. In Dunkley, the insured was a con artist who pretended to be a licensed psychiatrist. Once he was discovered and a suit was filed, the insured disappeared. He never notified his insurer, nor was he ever found. Dunkley, 350 N.C. at 575, 515 S.E.2d at 443.

-45-

also unlike <u>Morin</u>, Penn National had notice of the Underlying Lawsuit before entry of default; they also had cooperative opposing counsel who was willing to delay entry of default in order to give Penn National time to intervene. (<u>Id.</u> at 98-99.) Regarding the ability to enter a defense, there is at least an issue of fact as to whether it was Penn National's decision to not intervene or Viking's lack of cooperation that caused any prejudice here.[24]

## 2. <u>Conclusion Regarding Duty to Cooperate</u>

"The burden of proving material prejudice lies with the insurer." <u>Bissette</u>, 208 N.C. App. at 334, 703 S.E.2d at 177. Penn National has failed to present evidence that shows that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law as a result of any failure to cooperate by Kuone or Viking. In its motion for summary judgment, Penn National focuses on Kuone's

---

[24] Penn National's only argument that it was prejudiced by Viking's failure to cooperate was that it was unable to defend the Underlying Lawsuit without Viking, but there is also some implied question or whether Viking's cooperation was necessary to help develop any defense Penn National might have presented. Penn National does not expressly raise those arguments. Further, the court is not aware of any way in which Viking's lack of cooperation in 2017 materially prejudiced Penn National's ability to defend. There are genuine issues of material fact about the prejudice Viking's lack of cooperation caused Penn National.

-46-

unavailability as the fact that prevented it from hiring counsel to defend the Underlying Lawsuit; as <u>Morin</u> demonstrates, that difficulty does not establish prejudice as a matter of law. Penn National, therefore, is not entitled to judgment as a matter of law on its claim that Kuone failed to cooperate.

## C.    **Conclusion: Penn National's Motion for Summary Judgment**

Other than the delayed notice prong of the failure to notify claim, Penn National has failed to show that there is no genuine issue of material fact underpinning its failure to notify and failure to cooperate claims. When taking the facts in a light most favorable to Defendants, there are genuine issues of material fact as they pertain to the good faith and prejudice prongs of the <u>Great American</u> test for delayed notice. Likewise, there are genuine issues of material fact on the failure to cooperate claim. For these reasons, Penn National's Motion for Summary Judgment will be denied.

## IV.   **ANALYSIS OF DEFENDANTS IRVING AND HARRINGTON'S MOTION FOR SUMMARY JUDGMENT**

Defendants Irving and Harrington, as counter-claimants, also move for summary judgment on their own declaratory judgment action. Defendants move for summary judgment on the grounds that the record establishes, as a matter of law, that Viking did not breach either the notice or cooperation provisions of its

-47-

insurance policies. (Defs.' Br. (Doc. 55) at 2.) Penn National counters that the record establishes they are entitled to summary judgment and, therefore, Irving and Harrington's motion should be denied. (Pl.'s Resp. (Doc. 64) at 13.) The points of contention in Defendants' motion are the same as those in Penn National's: Viking's alleged failure to notify and breach of its cooperation clause.

Pursuant to the law and analysis, as explained and applied in Section III <u>supra</u>, the court briefly addresses each issue, taking the facts in a light most favorable to Penn National. <u>Rossignol</u>, 316 F.3d at 523. The court finds that there are genuine issues of material fact that require submission of the notice and cooperation questions to the trier-of-fact. The court will therefore deny Irving and Harrington's Motion of Summary Judgment.

### A. <u>**Viking's Failure to Notify**</u>

To review, the "<u>Great American</u> test" includes three prongs:

(1) whether there was a delay in notifying the insurer of a covered loss (the "Notice Element"); (2) if such notice was delayed, whether the insured acted in good faith with respect to the delay (the "Good Faith Element"); and (3) if the insured acted in good faith, whether the insurer was nevertheless materially prejudiced by the delay (the "Prejudice Element").

<u>Metric/Kvaerner Fayetteville</u>, 403 F.3d at 197-98 (citing <u>Great American II</u>, 315 N.C. at 718-19, 340 S.E.2d at 746-47). The

-48-

first prong is not contested, so the court need only address the "good faith" and "prejudice" prongs.

### 1. Good Faith Prong

There are genuine issues of material fact that prevent the court from granting summary judgment to Defendants Irving and Harrington on the failure to notify claim.

Beginning with the good faith prong, there are issues of fact that cannot be resolved at this stage. First, there is an issue of whether Kuone actually did attempt to report the accident in 2014, but his franchise's reporting systems failed. Second, there is an issue of whether Kuone received the Bell Letter in 2015 and whether that letter would have put him on notice that there was a possible claim against him. Finally, there are factual issues about when Kuone received notice of the Underlying Lawsuit and why he delayed notification. Kuone's credibility is a dispositive issue on most of these questions. As stated above, resolving issues of credibility is normally not appropriate on a motion for summary judgment. Reasonable jurors could choose not to believe Kuone's accounting of the events or his reasons for delay, making summary judgment on the failure-to-notify claim inappropriate.

Reasonable jurors could also apply the presumption that Viking actually received the Bell Letter in 2015 when Viking

-49-

still owned the Domino's franchises. If they do, then Kuone's argument that he did not think he was involved in a lawsuit would not be relevant since he was still the sole owner and officer of Viking at the time the Bell Letter was sent. Though the letter does not expressly mention a law suit, (see Bell Letter (Doc. 63-14) at 2), it did indicate that there were potential claims against Viking. Jurors may not believe Kuone when he claims to not remember receiving the letter; Kuone has problems remembering many events, even events that undoubtedly occurred. (See, e.g., Kuone Dep. (Doc. 56) at 37.) Kuone's wife, Shonda, also testified that she would place mail for Viking in one of two places for Steven Kuone to find it. (Shonda Kuone Dep. (Doc. 59) 11-12, 16.) Steven Kuone was in the habit of checking in those places for mail. (Kuone Dep. (Doc. 56) at 89-90.) Since the letter was properly addressed and not returned to sender, a reasonable juror could infer that it was received by someone at 305 Chastain Court and put in a place Kuone would find it, thus giving him renewed notice. In short, a reasonable juror could find the presumption of receipt was not rebutted based on Defendants' evidence.

Kuone maintained, as stated by Dilthey, that even though he knew something was going on with Viking in late 2016, that he did not think it actually involved him since Viking sold the

Domino's franchises. Though Kuone also testified that even after his April 11, 2017 deposition, he still did not understand how he was involved in the Underlying Lawsuit, a jury could choose not to believe Kuone's testimony on that point.

Added to all these issues is the fact that it is ultimately Defendants' burden to prove Viking acted in good faith in its failure to notify. Issues of subjective good faith are rarely appropriate for resolution on summary judgment. See supra, note 8. For that reason, the court will deny Defendants Irving and Harrington's Motion for Summary Judgment as to the good faith prong.

### 2. Prejudice to Penn National

The question of prejudice incurred by Penn National is closer, but the court still finds that there are genuine issues of material fact that preclude granting Defendants' motion.

By the time Penn National received notice in April 2017, more than thirty months had passed since the accident in September 2014. Penn National has not pointed to a specific witness which it could not reach, but the fact is that, after thirty months, memories fade. Since contributory negligence was one of the only mitigating factors cited by Penn National in its internal communications, (Gibson Dep. (Doc. 57) at 154), the testimony of eye witnesses would have been critical. Since the

-51-

events of that day happened in a matter of seconds, (see Dilthey Dep. (Doc. 58) at 28-30), it would also have been critical that eye witnesses offer precise testimony, something they would have been less able to do after almost three years.

Furthermore, some witnesses were not included in the accident report. (Id. at 23.) Though the report provided the names and some contact information for several witnesses, there could have been important witnesses who were not included. The witnesses who were interviewed also gave differing accounts. (RPD Report (Doc. 63-6) at 6-16.)

Since contributory negligence is a complete bar to recovery in North Carolina,[25] any lost evidence on this point would be both material and prejudicial in the defense of a negligence action. A reasonable juror could infer from the lapse of time that Penn National was materially prejudiced by Viking's failure to notify.

### 3. __Defendants' Motion Denied on Failure to Notify__

When viewing the record in a light most favorable to Penn National, there are genuine issues of material fact on both the

---

[25] "It is well established in North Carolina that a claimant's contributory negligence is a complete bar to recovery on a claim for damages sustained by reason of a defendant's negligent conduct." Whaley v. White Consol. Indus., Inc., 144 N.C. App. 88, 94, 548 S.E.2d 177, 181 (2001) (citing Smith v. Fiber Controls Corp., 300 N.C. 669, 268 S.E.2d 504 (1980)).

good faith and prejudice prongs of the failure to notify claim.
For that reason, Defendants Irving and Harrington's Motion for
Summary Judgment will be denied as to the failure to notify
claim.

### B.   <u>Failure to Cooperate</u>

The court finds that there is also a genuine issue of
material fact as it pertains to the failure to cooperate claim.

"[T]he failure to co-operate in any instance alleged must
be attended by prejudice to the insurer in conducting the
defense." <u>Henderson</u>, 254 N.C. at 332, 118 S.E.2d at 887. "The
burden of proving material prejudice lies with the insurer."
<u>Bissette</u>, 208 N.C. App. at 334, 703 S.E.2d at 177; <u>Guessford</u>,
918 F. Supp. 2d at 470.

Penn National's primary argument about prejudice resulting
from Kuone's failure to cooperate is its inability to defend the
Underlying Lawsuit. (Pl.'s Resp. (Doc. 64) at 10; <u>see also</u> Pl.'s
Br. (Doc. 63) at 21-22.) In light of North Carolina Rule of
Civil Procedure 24(a) and <u>Morin</u>, it is untenable to claim that
Penn National was required to reach Viking before it could
defend. However, just because Penn National could enter a
defense does not mean they were not prejudiced by Viking's
complete lack of cooperation.

-53-

First, there is probative evidence suggesting that Viking received Penn National's many communications and that Kuone understood he owed a duty to cooperate. Kuone personally signed for at least one reservation-of-rights letter from Penn National. (Penn National Letters (Doc. 63-25) at 2; June 13 Reservation of Rights Letter Signature Card (Doc. 60) at 1; Kuone Dep. (Doc. 56) at 49.) Penn National repeatedly used the email address and phone number that Kuone testified he monitored during the period in question. (Doc. 63-1 at 89, 93, 96; see generally Claim Notes (Doc. 63-23).) Though good faith is not a part of the failure to cooperate analysis,[26] Viking's lack of cooperation is indicative of the difficult task Penn National faced in defending an absentee defendant.

Second, the issue of Kearse's negligence was not clear. Cf. Bissette, 208 N.C. App. at 335-36, 703 S.E.2d at 178 (noting that an insured's complete absence was not prejudicial since the driver's negligence was so clear it was stipulated to by defense). There was evidence pointing to the contributory

---

[26] The Henderson failure-to-cooperate analysis does not include a good faith test, but the Great American failure-to-notify analysis does. See generally Henderson, 254 N.C. 329, 118 S.E.2d 885. Henderson's only mention of good or bad faith is a quote to a Maine Supreme Court opinion discussing misstatements made by insureds to insurers during an investigation. Id. at 333, 118 S.E.2d at 887. It is not asserted that Kuone made any such statements about the Underlying Lawsuit or 2014 accident.

negligence of Harrington, (Claim Notes (Doc. 63-23) at 9), and evidence that Kearse had been driving appropriately, (Kearse Dep. (Doc. 63-4) at 13-14; RPD Report (Doc. 63-6) at 7). Even though Kuone was not present at the scene of the accident, he was notified shortly after and may have had some information about what occurred that day.

Even more important than Viking's knowledge of the accident itself was Viking's understanding of its relationship with Kearse and whether Kearse was covered under its Penn National policies. This information was especially important since the Underlying Lawsuit proceeded on a theory of respondeat superior. (Doc. 1-3 ¶¶ 16, 21.) Viking was in the best position to describe its relationship with Kearse, the driver who struck Harrington.

Third, Penn National requested several pieces of information from Viking to assist in defending the Underlying Lawsuit. (See Penn National Letters (Doc. 63-25) at 2.) The first two items requested were any employee manual in effect at the time of the accident and any specific rules for drivers not listed in such a manual. (Id.) Though Gibson noted that there was no policy requirement that insureds have such manuals, nor did he cite any policy exclusions that might have applied to such rules, (see Gibson Dep. (Doc. 57) at 95-95), this evidence

-55-

could have assisted Penn National in mounting a personal injury defense. A driving manual and strict driving regulations would have helped demonstrate that Kearse, if following them, was not negligent and that Viking had helped ensure he was not.

Fourth, Penn National also requested any motor vehicle reports on Kearse that Viking pulled before or after the accident. (Penn National Letters (Doc. 63-25) at 2.) These reports were not required by Penn National's policy, (Gibson Dep. (Doc. 57) at 94), but would have been helpful in showing that Viking reviewed Kearse's driving record before hiring him and acted swiftly to correct any deficiencies soon after the accident. Again, the court cannot say as a matter of law that the lack of such evidence would not have materially prejudiced Penn National in its defense.

The materiality of prejudice resulting from an insured's failure to cooperate is usually a question for the jury. Henderson, 254 N.C. at 333, 118 S.E.2d at 888. Such is the case here. It is possible that Viking's failure to cooperate would not have materially prejudiced Penn National in defending this particular action; however, the record does not allow the court to conclude that as a matter of law. For that reason, Defendants' Motion for Summary Judgment will also be denied on the failure to cooperate claim.

-56-

## IV.  **CONCLUSION**

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary
Judgment, (Doc. 62), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants Irving and
Harrington's Motion for Summary Judgment, (Doc. 54), is **DENIED.**

This the 27th day of July, 2020.

_____
United States District Judge

Case 1:17-cv-01155-WO-JLW   Document 90   Filed 07/27/20   Page 57 of 57